## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | CIVIL ACTION |
| *Plaintiff*, | : | NO. 16-5773 |
| | : | |
| v. | : | |
| | : | |
| CHRISTOPHER K. SCHRICHTE, *et al.*, | : | |
| *Defendants*. | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                    MAY 20, 2026

## MEMORANDUM OPINION

The Securities and Exchange Commission, (the "SEC"), commenced this action against Defendants Christopher K. Schrichte, ("Schrichte"), Howard C. Hill, ("Hill"), Newmarket Global Management I, LLC, ("Global Management"), and Newmarket Technology Fund I, LLC, (the "Fund"), (collectively, "Defendants").[1]  In the complaint, the SEC asserts that Defendants engaged in fraudulent business practices by providing current and prospective investors annual reports that omitted material information regarding both:  (i) allegedly improper interest-free loans Schrichte and Hill drew from the Fund, and (ii) alleged misappropriations they took from the Fund and its sole-portfolio company, which together totaled nearly $1.5 million.

The SEC's asserted claims for relief are premised on Defendants' alleged violations of:  (1) Section 10(b) of the Securities and Exchange Act of 1934, (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, ("Rule 10b-5"); (2) Section 17(a) of the Securities Act of 1933, (the "Securities Act"), 15 U.S.C. § 77q(a); (3) and Sections 206(1), 206(2),

---

[1]    The Defendant entities—Global Management and the Fund—will hereinafter be collectively referred to as the "Corporate Defendants."

1

and 206(4) of the Investment Advisers Act of 1940, (the "Advisers Act"), 15 U.S.C. §§ 80b-6(1),

80b-6(2), 80b-6(4), and SEC Rule 206(4)-8, ("Rule 206(4)-8"), 17 C.F.R. § 275.206(4)-8.

Presently, before this Court is the SEC's motion for default judgment, Schrichte's response

in opposition, the SEC's reply in further support, the SEC's memorandum of law in support of its

requested financial remedies, Schrichte's opposition and amended opposition, the SEC's reply in

further support, and the parties' post-hearing briefing. (ECF 131, 134, 135, 140, 146-48, 153-57).

For the reasons set forth below, the default judgment entered February 28, 2025, is vacated, and

the SEC's complaint is dismissed, with prejudice.

**PROCEDURAL BACKGROUND**

The procedural history of this case has been summarized on numerous times. (*See, e.g.*,

ECF 113, 136). Nonetheless, a brief summary is helpful:

> On November 7, 2016 the SEC filed its complaint against Defendants. (ECF 1). On February 7, 2017, Defendants Schrichte and Hill proceeding *pro* se, filed an answer[2], (*see* ECF 8), and, pursuant to a Court approved extension, the Corporate Defendants filed a counseled answer on June 15, 2017. (*See* ECF 23). On June 19, 2017, the parties were ordered to commence discovery. (ECF 24). Soon thereafter, on July 28, 2017, the parties filed a joint Rule 26(f) report indicating, *inter alia,* that they were engaged in settlement discussions. (ECF 25 at 3). After the parties attended a settlement conference on May 30, 2018, with the Magistrate Judge, (ECF 39), the parties jointly moved on June 6, 2018, for the case to be held in civil suspense and represented that they were in the final stages of settlement. (*See* ECF 41). By Order dated June 6, 2018, this Court granted the joint request for civil suspense. (ECF 42).

> Thereafter, the parties attended several settlement conferences with the Magistrate Judge. (*See* ECF 43, 45, 48, 53-54, 56). On September 14, 2018, the SEC moved to reopen the case and requested revised case deadlines, representing that the negotiations had stalled. (ECF 57). By Order dated October 2, 2018, the Court granted the SEC's request. (ECF 58). Discovery ensued. The SEC filed two

---

[2]   By Order dated February 21, 2017, the Court noted that the *pro se* answer was proper only as it related to Schrichte and Hill and struck the answer to the extent it was also filed on behalf of the Corporate Defendants. (ECF 9).

successive motions to compel Defendants' participation, which were granted on February 28 and June 28 of 2019. (ECF 61-62, 65-66).

On August 5, 2019, the SEC filed its initial motion for default pursuant to Federal Rule of Civil Procedure, ("Rule"), 37 against Defendants arguing their noncompliance with the Court's discovery orders. (ECF 67). While the Rule 37 motion for default was pending as to all but Hill,[3] this matter was stayed a second time on January 10, 2020, (ECF 75), at the parties' request based on their claimed negotiated resolution.

The stay remained in place at the parties' continued requests until October 17, 2022, when the SEC represented to this Court that the negotiations had again reached an impasse, requested that the stay be lifted, and moved for a ruling on the pending motion for Rule 37 default as to Schrichte and the Corporate Defendants. (*See* ECF 105). On November 29, 2022, after more than three years since placed in civil suspense, the stay was lifted, and the parties were ordered to provide a joint or proposed briefing schedule on the SEC's Rule 37 motion. (ECF 107).

After supplemental briefs and responses were filed and considered, the Court granted the SEC's Rule 37 motion for default against Schrichte and directed the Clerk of Court to enter default against him. (ECF 113, 114).[4] By Order dated May 18, 2023, (ECF 124), Schrichte's motion to set aside the default was denied.

Notably, this Court received no submission from the Corporate Defendants or any attorney representing the Corporate Defendants[5] and eventually granted the SEC's Rule 37 motion for default against the Corporate Defendants. (ECF 122). The Court later denied a counseled motion to set aside the default filed on behalf of the Corporate Defendants. (ECF 130).

On July 25, 2025, the SEC filed pursuant to Rule 55(b)(2) the underlying motion for default judgment. (ECF 131). On August 30, 2025, Schrichte filed a response in opposition, to which the SEC submitted a reply on September 13, 2024. (ECF 134, 135). By Order dated February 28, 2025, this Court granted the SEC's

---

[3]     By Order dated February 19, 2020, the Court entered a Rule 37 default against Hill, who had been duly served with the SEC's complaint and its motion for default, and had failed to respond to the motion or to motions to compel discovery and orders. (ECF 76).

[4]     In its Memorandum Opinion granting the SEC's Rule 37 motion for default, this Court noted that Rule 55 provided an alternate basis to justify its entry of default against Schrichte (via the Clerk of Court). (*See* ECF 113 at 5).

[5]     Schrichte submitted a response in opposition on behalf of the Corporate Defendants, (ECF 119), that was stricken by Order of April 12, 2023, (ECF 121), because Schrichte is a non-attorney who cannot represent corporate parties. The Court invited a response from the Corporate Defendants, (ECF 117), which went unanswered.

motion for default judgment against all Defendants and scheduled a Rule 55(b)(2)[6] hearing to determine damages and civil penalties. (ECF 136). The hearing was held on November 4, 2025. (ECF 150, 151). The SEC and Schrichte supported their respective positions with post-hearing briefs. (ECF 153-57).

**FACTUAL BACKGROUND**

The relevant facts pertinent to the motion for default judgment are summarized as follows:[7]

According to the SEC's complaint and not disputed, Schrichte and Hill formed the Fund in 2001 with the purpose of investing in private technology companies. (ECF 1 at ¶ 14). Schrichte and Hill also founded Global Management around the same time to act as an unregistered investment adviser for the Fund. Pursuant to the terms of the Fund's operating agreement, the Fund was obligated to pay Global Management a management fee of 2% amounting to the aggregate amount of capital contributions invested less distributions per annum. (ECF 134-10 at 22). The SEC avers that Schrichte and Hill have controlled Global Management since its inception and have utilized this control to exercise final authority over all decisions made on behalf of the Fund. (ECF 1 at ¶ 15).

In 2001, the Fund invested in Celcorp, n/k/a TeraDact, Inc., ("TeraDact"), a software company. (*Id.* at ¶ 16; ECF 134-2 at ¶ 3). Schrichte testified that TeraDact was initially focused on developing an internet search engine and was founded and operated by the technology developers and others. (ECF 134-2 at ¶ 3). The Fund's controlling stake in TeraDact has been at all times the Fund's only investment. (ECF 1 at ¶ 16).

In 2007, the SEC avers that Schrichte and Hill appointed themselves to serve as TeraDact's sole officers, (*id.* at ¶ 17); specifically, Schrichte served as TeraDact's president and chief executive officer, and Hill served as executive vice president, general counsel, and secretary. (*Id.* at ¶¶ 8-9). According to Schrichte, he joined TeraDact at the request of its board during a period of struggle and was offered a starting salary around $180,000 — which Schrichte claims he did not collect in full. (ECF 134-2 at ¶ 7). Schrichte declares that, immediately upon starting employment with TeraDact, he refocused the company to use the search capabilities it had developed to identify and redact sensitive information from data and/or unstructured data in documents. (*Id.*).

---

[6]    Noting a typographical error in this Order, the Court clarifies that the hearing was set pursuant to Rule 55(b)(2), not Rule 55(c)(2).

[7]    These facts are gleaned primarily from the operative complaint, (ECF 1), as well as the evidence and testimony offered under oath at the November 4, 2025 damages hearing, (*see* ECF 151).

In the complaint, the SEC further avers that Defendants overall had raised approximately $21 million for the Fund from 75 investors. (ECF 1 at ¶ 14). Schrichte testified that since the Fund's first investment in TeraDact, the Fund lacked sufficient capital to pay the management fees owed to Global Management under the operating agreement. (ECF 134-2 at ¶ 4). The SEC avers that the Fund's sole portfolio company, TeraDact, has not been profitable since at least 2007, (*id.* at ¶ 16). The SEC also claims that between 2007 and 2014, Defendants were paid a combined total of $1,666,078 in salary from TeraDact. (*Id.* at ¶ 18). In addition, the SEC avers that Defendants took $955,000 in unauthorized personal interest free loans from the Fund — loans the SEC concedes were repaid in full by 2014 — and misappropriated an additional $499,558 from the Fund and TeraDact, allegedly for reimbursement of business expenses. (*Id.* at ¶¶ 19, 20, 27 30).

As to the unauthorized interest free loans, the SEC avers that the Fund's operating agreement provides, in relevant part, that:

> [Global Management] may not, without the prior written consent of a Majority in Interest of the [Fund's] Members . . . lend money to . . . any Person, unless [TeraDact] holds securities . . . issued by or otherwise owns an economic interest in such Person . . .

(*Id.* at ¶ 22). The SEC avers that the loans were drawn without seeking prior written consent from the Fund's investors or abiding by the agreement's other prerequisites. (*Id.* at ¶¶ 23, 37). Defendants concede that they were paid approximately the amount SEC claims as an aggregate salary and that, while the loans were in fact taken, they were drawn in lieu of paying Schrichte and Hill's earned management fees. (ECF 23 at ¶¶ 2, 19-20; ECF 134-2 at ¶ 5). Further, Defendants argue that these loans were taken on the advice of an accountant and that this payment structure would allow Schrichte and Hill to maintain their cost of living and receive some of the owed management fees, all while maximizing the available resources in TeraDact. (ECF 134-2 at ¶¶ 5, 53). Defendants do not dispute that the loans were taken without prior written consent of investors. (ECF 23 at ¶ 23). Schrichte testified that the management fees to which he was entitled and not paid far exceeded the amount of the loans; loans which the SEC admits were repaid. Schrichte further testified that the information surrounding the loans was made available to the Fund's investors in the annual reports and by the Fund's outside accountants, and no investor objected. (ECF 134-2 at ¶¶ 51, 53).

Regarding the misappropriations claimed, the SEC argues that Schrichte and Hill both testified during the SEC's investigative interviews that the payments made to them represented reimbursements for business expenses that were personally incurred. (ECF 1 at ¶ 30). However, the SEC contends that there was no justification for these transfers noted within the financial records pertaining to the Fund and/or TeraDact, and that no receipts or records identifying the legitimate business expenses were produced. (*Id.* at ¶¶ 29-30). Schrichte disputes that

5

assertion and produced at the hearing and in post-hearing briefing two legitimate business expense reports.  (ECF a 154-2, ECF 154-3).

The SEC further argues that Defendants misled the Fund's current and prospective investors in the annual financial reports for the years 2008, 2010, and 2012, which were also untimely distributed, regarding the money Schrichte and Hill transferred to themselves.  (ECF 1 at ¶¶ 31, 33).  Based on these allegedly misleading financial reports, the SEC avers that Defendants, between February 1, 2010 and February 20, 2014, raised $5.9 million from investors — of which almost $2.2 million went to Defendants as salary, improper loans, or other misappropriations.  (*Id.* at ¶¶ 3, 42).  Defendants deny these assertions.  (*See* ECF 8, 23).

Lastly, the SEC avers, and Defendants do not contest, that the parties agreed to three tolling agreements, which tolled the statute of limitations for the SEC's claims from May 8, 2015 through November 8, 2016.  (ECF 1 at ¶ 43).

### *Rule 55(b)(2) Hearing*

On November 4, 2025, this Court held a Rule 55(b)(2)[8] hearing that was attended by counsel for the SEC, counsel for Schrichte, and Schrichte himself.  A brief recitation of the testimony provided by Schrichte, the sole witness who appeared and testified, follows.[9]

Schrichte testified that the Fund was formed to invest in a company called CelCorp, eventually renamed TeraDact.  (ECF 151 at 68).  The Fund had a requirement that its managers  — Schrichte and Hill — co-invest alongside its investors at a 1% rate.  (*Id.* at 89).  Pursuant to said requirement, Schrichte testified that, between 2001-2017, he personally invested between $652,500 and $658,500 in the Fund; those monies would have been transferred into TeraDact for "working capital," (*i.e.*, to pay business expenses, salaries for developers, and intellectual property protection).  (*Id.* at 90).

---

[8]    Rule 55(b)(2) provides, *inter alia*, that "[t]he court may conduct hearings . . . when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter."  Fed. R. Civ. P. 55(b)(2).

[9]    In advance of the hearing, the SEC produced a declaration of Jacquelyn D. King, a staff accountant in the Division of Enforcement of the SEC, attesting to her calculations of Schrichte's ill-gotten gains and prejudgment interest as a result of the alleged securities fraud.  (*See* ECF 131-2).  Ms. King, however, was not made available as a witness at the hearing.  Counsel for the SEC represented to the Court that he himself directed Ms. King what values to use to inform her calculations.  (*See* ECF 151 at 24) (Counsel for the SEC noting that he "directed [Ms. King] what to deduct [to yield her estimation of Schrichte's ill-gotten gains] based on [his] knowledge of the case . . . [a]nd so [Ms. King] was not making judgment calls, she was . . . a summary fact witness just performing calculations.").

Schrichte initially was involved with TeraDact only as a co-manager of the Fund, which held a controlling stake in TeraDact. *(Id.* at 67-69). However, in 2007, he became TeraDact's President and CEO and served in those capacities for approximately fourteen years. *(Id.*). Schrichte testified that his responsibilities as CEO of TeraDact included: developing the business by attending conferences, pitching to prospective clients, and serving on industry panels which concentrated on the protection of sensitive data; contributing to the advancement of TeraDact's product as a listed inventor of 7 patents; managing TeraDact's employees, including a group of developers ranging from 4-15 resident to TeraDact's office in Alberta, Canada; raising funds; and recruiting a board of advisors which included former high ranking government officials and former executives of large software companies, such as Microsoft and healthcare companies. (*Id.* at 57, 69, 68-73, 114-115).

TeraDact's product evolved over time. Early into Schrichte's tenure as President and CEO, a business presentation gave rise to the idea of developing the TeraDact product into a redaction technology to support companies in protecting their data by automating cloud storage and retrieval in a manner that did not jeopardize private records. (*Id.* at 58, 68-69). As an example of its technology, Schrichte explained that TeraDact's software could be used to aid the Government in responding to a FOIA request by automating the redaction of sensitive information found within the responsive documents. (*Id.* at 74).

Schrichte testified he had confidence in TeraDact's product and the company's prospects. However, TeraDact was still building toward profitability during the economic downturn of 2007. Schrichte testified that in 2007-2008, he loaned $180,000 to the Fund to be used as working capital. (*Id.* at 87-88). Schrichte testified that the $180,000 loan was reflected in the tax returns for the Fund, which were prepared by outside accountants and provided to the SEC. (*Id.* at 118-19).

Further, Schrichte testified that Defendants' accountant recommended that Schrichte and Hill take loans from the Fund in lieu of the management fees they were entitled to so as to ensure the financial stability of TeraDact. (*Id.* at 81). Heeding that advice, Schrichte and Hill drew a total of $955,000 in interest-free loans from the Fund. (*Id.* at 81-82). That figure, according to Schrichte's testimony, is also documented by Defendants' accountant. (*Id.* at 82). Schrichte further testified that the loans to Schrichte and Hill were fully disclosed in the Fund's financial statements to investors. (*Id.* at 81). Defendants also did not, at any point during their tenures with TeraDact, take the entire salaries to which they were entitled. (*Id.* at 93). Schrichte testified that during his tenure with TeraDact, he continually made efforts to raise money, and that such efforts involved extensive traveling, especially in 2015. (*Id.* at 69, 71-72).

Schrichte testified that between 2009 and 2010, Microsoft expressed interest in acquiring TeraDact and he understood that as meaning that Microsoft recognized the potential value of TeraDact's software. (*Id.* at 68-71). Schrichte

7

testified that between 2012 and 2021 TeraDact received a significant number of requests for proposals and/or for information from county, state, and federal agencies seeking to address the need to clean information from documents that might be made publicly available. (*Id.* at 73-74). In 2015, TeraDact was one of twenty-two companies to win a federal contract worth $310 million. (*Id.* at 68-69, 135-36).

Notwithstanding these growth opportunities, Schrichte testified that he observed a change in TeraDact's business prospects after the SEC began its investigation into the company in 2013. (*Id.* at 76). Schrichte testified that, at the outset, he instructed Hill, as general counsel, to produce all responsive documents to the SEC. The company ultimately hired an attorney to compile the information. (*Id.* at 76-77). Schrichte attended three days of interviews with the SEC, during which the SEC confronted and questioned him, *inter alia*, about his personal credit card statements and statements from TeraDact's Canadian subsidiary — questions he answered truthfully. (*Id.* at 77-78). Upon the SEC's request, Schrichte asked the entity involved in the classified contract to provide information of said contract to the SEC and, thereafter, all communications between TeraDact and the entity ceased. (*Id.* at 134-135). In Schrichte's opinion, that contract would have increased the value of TeraDact by multimillions. (*Id.* at 135-136).

As the SEC's investigation continued, the propriety of the Fund's loans to Schrichte and Hill appeared to become an area of interest for the SEC. Schrichte testified that he and his wife discussed whether they could pay back the loans to persuade the SEC to discontinue its investigation so TeraDact could continue to flourish. (*Id.* at 83). Schrichte and his wife decided to sell their only major asset, their home in Washington D.C., and used a significant portion of the proceeds from the sale to repay the loans Schrichte and Hill had taken against the Fund, and to contribute a portion to the working capital in TeraDact. (*Id.* at 83-85). Schrichte testified that, between 2014-2016, he contributed approximately $1,324,377 into TeraDact from the proceeds obtained in the sale of his home. (*Id.* at 83-86).

During the hearing, Schrichte also introduced exhibits reflecting one of TeraDact's employees' legitimate business expenses, for which the employee was reimbursed by TeraDact, and testified that he personally covered and sought reimbursement for additional business expenses not captured within the annual reports but clearly related to legitimate business expenses. (*Id.* at 106, 123; ECF 154-2, ECF 154-3). In responding to the SEC's motion for default judgment, Schrichte submitted with his briefing as an exhibit the Fund's 2012 annual report, which details cash flow concerns. (*See* ECF 134-10). Schrichte testified that he was focused on giving Fund investors "a good, meaningful return on their investment, [and] that's why [he] went to great lengths to keep the company going, and [ ] put [his] own money in [the Fund] in order to provide a positive return for the investors." (ECF 151 at 121:18-121:22).

8

In 2016, when the SEC filed its complaint against Defendants, the SEC issued a press release about its investigation. Schrichte testified that, in July 2019 — prior to the SEC's filing of the August 5, 2019 motion for Rule 37 default — he believed he had reached a settlement of the SEC's claims, and in January 2020, he signed paperwork accepting the settlement agreement. (*Id.* at 136-37). Moreover, Schrichte declares that, in May 2020, he deposited $5,000 toward the agreed settlement amounts at the SEC's request. (ECF 134-2 at ¶ 25).

Although Schrichte was unrepresented during those settlement negotiations, counsel for TeraDact was privy to those discussions as a third-party. (ECF 151 at 112, 126). Months after Schrichte signed the settlement agreement in January 2020, following the SEC's counsel's representation to TeraDact's counsel that final approval of the settlement was pending, Schrichte testified that counsel for TeraDact recommended the sale of TeraDact's assets through an Assignment for the Benefit of Creditors, ("ABC"), sale. (*Id.* at 126-28). Schrichte testified that he believed the recommendation was driven, *in part*, by the stain of the SEC's investigation into the company and the press release publicizing the litigation. (*Id.* at 136).

Schrichte testified that he abstained from participating in the shareholder vote concerning the ABC sale, but that he ensured all TeraDact shareholders and members of the Fund were informed of the ABC process and had an opportunity to object or participate. (*Id.* at 113, 126-28). Schrichte testified that no objections to the ABC sale were raised. (*Id.* at 130). In his view and based on his understanding at the time, the ABC sale would have provided TeraDact a "clean slate." (*Id.* at 60). Accordingly, he continued efforts to grow the business, including by revising the patents as of as late as 2021. (*Id.*).

However, Schrichte further testified that the SEC interfered with the ABC process by calling the prospective buyers and, as a result, Fund members were denied the opportunity to be a part of the entity acquiring TeraDact's assets. (*Id.* at 130). Thus, once the ABC sale had been consummated, TeraDact's assets went to another entity, but its investors did not. (*Id.* at 130). At present, Fund investors — including Schrichte — received nothing for their investment. (*Id.* at 130). According to Schrichte's declaration, public records show that the TeraDact software is currently being used by clients in New York, Colorado, and England. (ECF 134-2 at ¶ 60).

Schrichte further declares that, on or around May 7, 2021, he received proposed revised settlement terms from the SEC. (*Id.* at ¶ 26). The SEC argues that its settlement negotiations with Schrichte fell apart because of the ABC sale, while Schrichte contends that the SEC delayed the settlement for so long until certain impactful legislation became law to seek a higher settlement than what was initially agreed upon.

9

In all, Schrichte testified that he invested and contributed a total of $2,099,827 in TeraDact through the Fund between 2001-2017. (ECF 151 at 92); (ECF 154-1). Currently, Schrichte is partially retired and working as a part-time baggage handler at the airport in Missoula, Montana. (ECF 151 at 67).

**LEGAL STANDARD**

Rule 37 addresses the failure to make disclosures or to cooperate in discovery and sanctions. *See* Fed. R. Civ. P. 37. Specifically, Rule 37 provides, *in part*, that district courts may impose a default judgment against a party for failure to obey an order to provide or permit discovery. *See* Fed. R. Civ. P. 37(b)(2). Similarly, Rule 55 addresses default and default judgment. *See* Fed. R. Civ. P. 55. Specifically, Rule 55 provides district courts with the authority to enter a default judgment against a party that "has failed to . . . defend" the action, Fed. R. Civ. P. 55(a), including in situations where a party fails to comply with the court's orders. *See Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 918-19 (3d Cir. 1992).[10]

"Default judgments are generally disfavored in the [United States Court of Appeals for the Third Circuit, (the "Third Circuit")]." *Tristrata Tech., Inc. v. Medical Skin Therapy Research, Inc.*, 270 F.R.D. 161, 164 (D. Del. 2010) (citing *Budget Blinds, Inc. v. White*, 536 F.3d 244, 258 (3d Cir. 2008)). In *Chamberlain v. Giampapa*, 210 F.3d 154 (3d Cir. 2000), the Third Circuit established factors the district court must consider in its determination of whether to grant a default judgment. The *Chamberlain* factors that the court must weigh are the following: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and

---

[10] Rule 55 proscribes a two-step process for a party seeking a default judgment. "First, a plaintiff must request that the Clerk of Court enter default against a nonresponding defendant. Once the Clerk of Court enters default, unless 'the plaintiff's claim is for a sum certain or a sum that can be made certain by computation,' the plaintiff may proceed to the second step, and 'apply to the court for a default judgment.'" *Talbert v. Pennsylvania*, No. 23-cv-1338, 2025 WL 984394, at *12 (M.D. Pa. Mar. 31, 2025) (quoting Fed. R. Civ. P. 55(b)(1), (2)).

(3) whether the defendant's delay is due to culpable conduct." *Id.* at 164. Nevertheless,"[i]t is well settled in this Circuit that the entry of default judgment is left primarily to the discretion of the district court." *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984).

"Even if a default judgment may be appropriate, however, the Court must first 'ascertain whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.'" *Specialty Freight Servs., Inc. v. Morris Trans Corp.*, No. 3:24-CV-00672, 2025 WL 778062, at *2 (M.D. Pa. Mar. 11, 2025) (quoting *Serv. Emps. Int'l Union Loc. 32BJ, Dist. 36 v. ShamrockClean, Inc.*, 325 F. Supp. 3d 631, 635 (E.D. Pa. 2018)). In making this assessment, the court, "[a]s at the motion to dismiss stage, . . . accepts as true the well-pleaded factual allegations in the plaintiff's complaint, except those relating to damages, as though they were admitted or established by proof, as well as reasonable inferences that can be drawn from the complaint[.]" *Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 270 (E.D. Pa. 2014). "Conclusory allegations and the parties' legal theories or 'conclusions of law' are not entitled to the same presumption and are not deemed admitted." *Id.* at 270-71 (quoting 10A Charles Alan Wright, Arthur R. Miller, *et al.*, *Federal Practice and Procedure* § 2688 (3d ed. 2013)).

"If the court determines that the plaintiff has stated a cause of action, it must then assess damages." *Joe Hand*, 3 F. Supp. 3d at 271. "Unlike liability, unless damages are 'liquidated or computable,' they 'cannot be awarded simply on the basis of the pleadings, but must instead be established at an evidentiary hearing held pursuant to [Rule] 55(b)(2),' or otherwise by such proof as the plaintiff may submit without a hearing." *Id.* (quoting *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990)) (footnote omitted) (alteration in original). That is, "[a] party's default

11

does not suggest that the party has admitted the amount of damages that the moving party seeks."

*E. Elec. Corp. of New Jersey v. Shoemaker Const. Co.*, 652 F. Supp. 2d 599, 605 (E.D. Pa. 2009).

**DISCUSSION**

In its motion for default judgment filed pursuant to Rule 55(b)(2), the SEC argues that its complaint establishes Defendants' liability with respect to their violations of various securities laws and seeks injunctive as well as equitable relief. Only Schrichte filed an answer and a viable response in opposition to the motion for default judgment,[11] wherein he asks this Court to exercise its discretion to deny the SEC's motion on several grounds, including, *to wit*: default should have never been entered; the SEC's motion for default judgment was filed in bad faith; the SEC's conduct during litigation violated Schrichte's due process rights; and the complaint is devoid of well-pled factual allegations to support liability on default.[12] In his opposition to the motion for default judgment, Schrichte also appears to move again, pursuant to Rule 55(c), to set aside the

---

[11]     *See supra* note 5.

[12]     Because this Opinion focuses on the essential elements of default judgment, the merits of Schrichte's tangential arguments are not reached. However, it is clear that "[b]ecause the penalty the SEC seeks would 'depriv[e]' [the defendant] of 'property,' due process demands nothing less than 'the process and proceedings of the common law[.]'" *SEC v. Jarkesy*, 603 U.S. 109, 151 (2024) (Gorsuch, J. concurring) (citation modified). In light of said principle, the Court offers the following observations about Schrichte's due process and bad faith arguments. There appears to be merit to Schrichte's position that, though the SEC's renewed motion for default was premised on Schrichte's failure to provide discovery in this case, the SEC apparently obtained said discovery through its pre-suit investigation and during the three years of settlement negotiations. Moreover, Schrichte testified that on October 26, 2022, he delivered responses to the SEC's interrogatories underlying its Rule 37 motion for default — months before the SEC renewed its request to this Court for Rule 37 default against Schrichte. (ECF 134-2 at ¶ 47). These allegations have not been contested by the SEC. Likewise, it cannot be ignored how closely the faltering of the agreed-upon – but never finalized – settlement coincides with the passage of the amendments to the National Defendant Authorization Act for Fiscal Year 2021 which, *inter alia*, "extended the statute of limitations for SEC scienter-based claims for disgorgement to 10-years." *SEC v. Gallison*, 588 F. Supp. 3d 509, 519 (S.D.N.Y. 2022).

12

Court's entry of default judgment or, in the alternative, hold an evidentiary hearing.[13]

As noted, a damages evidentiary hearing was held.  The parties supplemented their positions in post-hearing briefings.  In these briefings, the parties advance competing views as to the appropriate steps for the Court following the Rule 55(b)(2) hearing.  The SEC argues that the Court may only consider the testimony presented at the hearing to assess proper remedies, while Schrichte continues to advance arguments that the SEC's claims are insufficient for liability on default or, alternatively, that the SEC's financial remedies requests should be rejected as inconsistent with the record and principles of equity.

Initially, this Court recognizes that this case presents an unusual default judgment posture. Defendants' defaults are a result of Defendants' alleged failure to respond to discovery requests. Based on the SEC's initial motion, this Court precluded Defendants from contesting liability by directing the Clerk to enter default pursuant to Rule 37.[14]  It was in this context in which this Court considered the SEC's motion for default judgment pursuant to Rule 55(b)(2).  Pursuant to the facts and filings available to this Court *at that time*, this Court determined the sanction of default judgment was appropriate contingent on a Rule 55(b)(2) hearing. [15]

Despite its prior finding, this Court "retains the discretion to determine whether default judgment is appropriate." *Finkel v. Triple A Group, Inc.*, 708 F. Supp. 2d 277, 280 (E.D.N.Y.

---

[13]    The parties additionally address the *Chamberlain* factors.  As this Court has previously considered the parties' arguments with respect to those factors and conducted the requisite analysis, (*see, e.g.*, ECF 113, 124, 130, 136), it need not and does not consider them again here.

[14]    *See supra* at note 4.

[15]    Importantly, the February 28, 2025 Order, (ECF 136), which granted the SEC's motion for default judgment, was not a *final* default judgment as the question of damages was left unanswered.  *See Subar, Inc. v. Precision Plastics, Inc.*, No. CIV. A. 96-2815, 1998 WL 150992, at *3 (E.D. Pa. Mar. 27, 1998) (noting an order imposing default judgment and setting a damages hearing which failed to require defendant to pay or do anything "was not literally a final judgment . . . and did not terminate the litigation.").

13

2010); *see also Pope v. United States*, 323 U.S. 1, 12 (1994) ("[U]pon default, . . . the court determines that the unchallenged facts shown of record establish a legally binding obligation; it adjudicates the plaintiff's right of recovery and the extent of it, both of which are essential elements of judgment." (citations omitted)); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981) (noting that, even after default is determined, a district court "need not agree that the alleged facts constitute a valid cause of action"). That is, "[e]ven after default . . . it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." *Directv, Inc. v. Asher*, No. 03-cv-1969, 2006 WL 680533, at *1 (D.N.J. Mar. 14, 2006) (quoting 10A Wright & Miller § 2688, at 63) (alteration in original).

Accordingly, the Court will first address whether the defaulted Defendants may be properly held liable for the securities violations pled, and whether the SEC's submissions justify the relief sought. To make this determination, this Court relies on "the well-pleaded factual allegations [and] the reasonable inferences that may be drawn from them, as well as the documentary evidence . . . submitted on the docket." *Joe Hand*, 3 F. Supp. 3d at 273. This Court will also consider the testimony provided at the damages evidentiary hearing. Finally, if warranted, the Court will determine the appropriate amount of damages, if any.

## I. Liability

### a. First Claim for Relief: Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

Turning to the first claim for relief, the SEC has alleged violations of Section 10(b) of the Exchange Act and its implementing regulation, Rule 10b-5. Section 10b of the Exchange Act provides, in pertinent part, that "[i]t shall be unlawful for any person . . . (b) to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . ." 15 U.S.C. § 78j(b). "Rule 10b-5 implements [S]ection 10(b)[.]" *Riley v. Simmons*, 45 F.3d 764, 773 n.9 (3d Cir. 1995). As such, Rule 10b-5 makes it unlawful for any person to, *inter alia*, "omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading or [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

"Congress . . . enacted [in the Exchange Act] a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990); *see also* 15 U.S.C. § 77b(a)(1) ("The term 'security' means any note, stock, . . . investment contract, . . . or, in general, any interest or instrument commonly known as a 'security,'. . .). Here, the Fund's membership interests were securities subject to these rules.

To state a claim under Section 10(b) and Rule 10b-5, the SEC "must show: (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter." *SEC v. Teo*, 746 F.3d 90, 103 (3d Cir. 2014) (internal citation and quotation marks omitted). Moreover, "[a] plaintiff in a securities fraud action must satisfy the heightened pleading standards of the [Private Securities Litigation Reform Act of 1995.]" *Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, 606 F. Supp. 3d 124, 130 (E.D. Pa. 2022) (citing 15 U.S.C. § 78u-4).

The Private Securities Litigation Reform Act of 1995, (the "PSLRA"), necessitates that a plaintiff in a securities fraud action "must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief . . . state with particularity all facts on which that belief is formed.'" *Id.*

15

(quoting 15 U.S.C. § 78u-4(b)(1)).  Further, the "complaint must . . . 'state with particularity facts giving rise to the strong inference that defendant acted with the required state of mind.'"  *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

In its motion for default judgment, the SEC argues that its complaint establishes Defendants' liability under Section 10(b) and Rule 10b-5 by alleging that they knowingly and recklessly deceived investors through materially misleading annual reports in connection to the sale of the Fund's membership interests.  Schrichte counters that the SEC's complaint contains only generalized and conclusory statements instead of well-pled allegations; and that said allegations cannot be relied upon to establish any bad faith on the part of Defendants.  Because it is undisputed that the Fund's membership interests are securities, the Court's analysis focuses on the elements of material misrepresentation and scienter.

### i. Materiality

The United States Supreme Court has instructed that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 249 (1988) (adopting the *TSC* materiality standard for the Section 10(b) and Rule 10b-5 context).  "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Id.*  Further, "[a]n omitted fact may be immaterial if the information is trivial, or is 'so basic that any investor would be expected to know it,'"  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (first citing *Basic*, 485 U.S. at 231; then quoting *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir. 1998)).

To satisfy the pleading requirements, a complaint alleging material misrepresentations "must 'specify each [omission] alleged to have been misleading [and] the reason or reasons why

16

the statement is misleading . . .'" *Fan v. StoneMor Partners LP*, 927 F.3d 710, 714-15 (3d Cir. 2019) (quoting 15 U.S.C. § 78u-4(b)(1)).  However, if the complaint contains "claims of omissions or misstatements that are obviously so unimportant [for a reasonable investor making an investment decision,]" dismissal is appropriate as a matter of law.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  In assessing materiality, "a court must appraise a misrepresentation or omission in the complete context in which the author conveys it."  *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 369 (3d Cir. 1993).

Here, the SEC avers in its complaint that Defendants omitted the following information from the Fund's annual statements; *to wit*:  (1) that the Fund's outstanding loans to Global Management ($955,000) were actually loans to Schrichte and Hill for their personal use; (2) that the promissory notes underlying those loans were not contemporaneously prepared; (3) that the maturity dates on the loans were unilaterally extended in contravention of the terms of the promissory notes; and (4) the full amount of money transferred to Schrichte and Hill ($499,558) from the Fund and TeraDact for purported reimbursement of business expenses.

However, specifying each omission alleged to be misleading does not suffice the pleading purposes of the PSLRA since the PSLRA additionally requires averments that set forth the reason or reasons why the statement is misleading.  As to the first omission, the SEC appears to contend that the annual reports are misleading because the omitted information constitutes an undisclosed conflict of interest.  (*See* ECF 1 at ¶ 20) ("Directing the Fund to make [the] loans represented a conflict of interest . . . which they did not fully disclose to investors. . .").  With respect to omissions 2-4 above cited, the SEC baldly concludes that these omissions "rendered the Fund's financial statements materially misleading," (*id.* at ¶ 42),  without providing any explanation as to *why* those omissions rendered the Fund's annual statements materially misleading.  As such, the SEC failed

17

to adequately plead above-cited alleged omissions 2-4 with particularity required by the PSLRA. *See AdaptHealth Corp.*, 606 F. Supp. 3d at 130 (noting that, under the PSLRA, the plaintiff "must 'specify each statement alleged to have been misleading[ and] the reason or reasons why the statement is misleading[.]'").

Nevertheless, setting aside the pleading deficiencies, the Court has also considered the materiality of the alleged omissions. As to the first omission regarding the claimed improper loans, the SEC acknowledges that those claimed improper loans were completely repaid seven years after the first loan was drawn. The SEC further avers that the total amount invested by 75 investors, which include Schrichte and Hill, in the Fund was $21 million. As noted, Schrichte credibly testified that the loans were drawn on the advice of accountants and the sign-off of counsel in consideration of TeraDact's financial condition, in lieu of management fees they could have taken, and that this arrangement was made known to investors.

The Fund's 2012 annual report clearly advised investors that cash flow problems existed. For instance, the annual statement reported that: "[TeraDact] continues to operate as a going concern, although operations continue to be difficult in terms of maintaining a steady flow of resources to support potential projects and in terms of day-to-day operating capital" and that "[i]n the event that [TeraDact] is unable to stabilize its capital structure, the Fund may be forced to liquidated its investment in [TeraDact] on unfavorable terms." (ECF 134-10 at 4, 5). The report also makes clear that the Fund's management fees were continuing to accrue but had not been paid to Global Management in accordance with the Fund's operating agreement, and that "[a]ll Funds borrowed by the Fund have been either invested in [TeraDact] or used by the Fund for general corporate purposes." (*Id.* at 5). In this context, where a small portion of the invested funds were allocated to pay a fraction of the management fees owed to Schrichte and Hill in a manner that

18

would best support the Fund's investment in TeraDact, and the Fund's members were made aware of the fact that the Fund may not be profitable, the Court finds the alleged omissions about the specifics of the loans are immaterial as a matter of law. *See Klein v. General Nutrition Companies, Inc.*, 186 F.3d 338, 343-44 (3d Cir. 1999) (finding specifics of business operations omitted from a prospectus immaterial because the prospectus also contained meaningful warning to investors that the corporation's expansion plans might not be possible or profitable).

Regarding the omissions related to the full amount of reimbursed business expenses, the SEC argues that $499,558 was misappropriated as claimed expense reimbursements between 2007 to 2014, yet the SEC relies only on the annual reports for 2008, 2011, and 2012 to support its claim. The SEC takes issue with the fact that those statements disclosed only $16,000 in business expense reimbursements to Schrichte and Hill between 2008 to 2012. However, the SEC concedes that "Related Party Transactions" were disclosed, including rent owed to Schrichte, and that the Fund's annual reports for 2012 indicates that the aggregate amount of rent due to Schrichte was $135,000. (*See* ECF 134-10 at 23). Accordingly, even accepting the claimed omission as true, the maximum amount of undisclosed reimbursement over that four-year span would be $350,000 — a negligible sum for a Fund when compared to the $21 million raised in investment. The SEC has not argued, and the Court strains to infer, how such a *de minimis* omission would be considered by a reasonable investor as important to his investment decision. This is especially true where the expenses are clearly associated with the management of an investment vehicle which raised approximately $21 million in investment. Therefore, the Court finds the omissions alleged related to the misappropriations claim are immaterial as a matter of law.

In reaching these conclusions, the Court finds the SEC's reliance on specific caselaw unpersuasive and, frankly, inapposite. In its briefing, the SEC points this Court to *Vernazza v.*

19

*SEC*, 327 F.3d 851 (9th Cir. 2003).  There, the Ninth Circuit upheld the SEC's imposition of sanctions for violations of, *inter alia*, Section 10b and Rule 10(b)-5 against petitioner investment advisers who failed to disclose to clients their own interest in a certain fund.  *Vernazza*, 327 F.3d at 858-864.  The petitioners were indebted to another investment adviser and had also entered into a servicing agreement with that adviser relating to its affiliated funds, entitling the petitioners to a percentage of the value of investments their clients made in the investment adviser's affiliated fund.  *Id.*  However, in engagement letters to clients and in SEC filings, the petitioners falsely represented that they had no financial interest in and did not receive commissions for recommending the entity's funds.  327 F.3d at 856.  The Ninth Circuit concluded that the petitioners made "materially false statements when they claimed not to recommend securities in which they had an ownership or sales interest, not to receive economic benefits in connection with giving advice to clients, and not to recommend securities in which they had a financial interest" based on the principle that "potential conflicts of interests are 'material' facts with respect to clients and the [SEC]."  *Id.* at 859-60.

Here, unlike in *Vernazza*, the Fund's investors were not under any disillusionment about the Fund's operating structure or Defendants' involvement.  Moreover, the potential conflict of interest arising from Schrichte and Hill's personal loans is far less severe than the omissions at issue in *Vernazza*.  The Fund's investors knew that Global Management was the entity managing the Fund's investment in TeraDact, and that Schrichte and Hill were the sole officers of Global Management; the investors were privy to TeraDact's cash flow issues, as any investor involved with a start-up should be.  Therefore, this Court cannot deem the alleged omissions about the nature and extent of the loans to Schrichte and Hill material on the grounds that the omission amounted to an undisclosed conflict of interest based on the precedent cited.

20

### ii. Scienter

For purposes of securities law liability, "[s]cienter . . . consists of 'a mental state embracing intent to deceive, manipulate, or defraud.'" *In re Maiden Holdings, Ltd. Sec. Litig.*, 153 F.4th 354, 368 (3d Cir. 2025), *reh'g denied*, No. 24-1118, 2025 WL 2671744 (3d Cir. Sept. 16, 2025) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007)). "It is well-settled that scienter is a necessary element of a claim under [Section] 10(b) and Rule 10b-5." *Clearfield Bank & Tr. Co. v. Omega Fin. Corp.*, 65 F. Supp. 2d 325, 343 (W.D. Pa. 1999). Establishing scienter "requires proof that the defendant made a misrepresentation or omission of material fact with 'a mental state embracing intent to deceive, manipulate, or defraud.'" *WM High Yield Fund, et al. v. O'Hanlon, et al.*, 964 F. Supp. 2d 368, 372 n.5 (E.D. Pa. 2013) (quoting *Tellabs*, 551 U.S. at 319). In the Third Circuit, scienter also "includes recklessness," which is defined as "[h]ighly unreasonable (conduct) [that amounts to] an extreme departure from the standards or ordinary care, . . . " *SEC v. Infinity Group Co.*, 212 F.3d 180, 192 (3d Cir. 2000) (citation modified).

To adequately plead the element of scienter, "a complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *StoneMor Partners*, 927 F.3d at 715 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "The Third Circuit has described the analysis of the existence of a 'strong inference of scienter' as a 'totality-of-the-circumstances test' that relies on a court's 'practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter.'" *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 467 (E.D. Pa. 2014) (quoting *Institutional Investors Grp. v. Avaya, Inc.,* 564 F.3d 242, 269 (3d Cir. 2009)).

Here, even if the SEC had properly plead omissions that were material as a matter of law (it has not), the SEC's first claim for relief fails for the additional reason that the averments in the

21

complaint fail to meet the heightened pleading requirements applicable to the element of scienter. Rather, the SEC's allegations purport to bolster a general inference of fraudulent conduct by averring that Schrichte and Hill used their control to loot the Fund's money "to line their own pockets." (ECF 1 at ¶ 1). Mere conclusory allegations, however, that Defendants conduct was knowing or reckless does nothing to bolster a "strong inference" that Defendants acted with scienter. Further weighing against an inference of scienter is the fact that, as to Schrichte, the claimed improper loans were used to pay routine living expenses. This is not the case of an individual siphoning huge portions of money for personal enrichment. Even accepting the "whole factual picture painted by the complaint," *Viropharma*, 21 F. Supp. 3d at 467, this Court cannot deem it more likely than not that Defendants acted with the requisite scienter to commit a securities violation.

Moreover, the record does not show any fact to support the element of scienter in this case. While the SEC avers the loans were used to fund personal expenses and attempts to cast doubt on Schrichte and Hill's testimonies to the contrary, the SEC does not trace the misappropriations to any improper personal use. Schrichte also credibly testified as to the business expenses incurred and for which funds were used to pay these expenses. Thus, even had the SEC had properly plead omissions that were material as a matter of law, the SEC's Section 10(b) and Rule 10b-5 claims fail for the additional reason that they did not properly plead, nor can they possibly establish the element of scienter.[16]

---

[16] The SEC also offers, as its primary argument, that because all Defendants are in default, this Court must accept as admitted the complaint's averments that Schrichte, Hill, and the Fund "acted knowingly or recklessly" in violating the various securities laws. (ECF 131 at 11). This argument is misguided. Rather, a defaulted defendant "is deemed to admit to well-pleaded factual allegations but is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Barrett v. Tri-Coast Pharmacy, Inc.*, 518 F. Supp. 3d 810, 822-23 (D.N.J. 2021) (internal citation and quotation marks omitted). Accordingly, the SEC's primary argument as to scienter is rejected.

Therefore, this Court finds that the noted omissions alleged in the annual reports – even if they were deemed material, a premise this Court rejects – were not made with any fraudulent intent, evidenced by the fact that Schrichte and Hill's business practices were carried out based on the professional advice of their outside accountant and counsel, which they believed to be sound. Schrichte's testimony at the hearing, which this Court found credible, further bolsters the point that, in his view, his and Hill's actions in taking loans, instead of management fees or full salaries and taking reasonable reimbursements for legitimate business expenses, were actions taken with the intention of making TeraDact profitable and yielding investment returns.

Accordingly, this Court vacates the Order which imposed default judgment against Defendants as to the SEC's Section 10(b) and Rule 10b-5 claims as it is *now* clear there is no legal liability that should be imposed against any Defendant for the alleged securities fraud. Accordingly, these claims asserted in the complaint are dismissed. *See Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank*, 515 F.2d 1200, 1206-08 (5th Cir. 1975) (vacating default judgment as to a claim that appeals court found was both unsupported by the pleadings and facially implausible); *see also Subar, Inc.*, 1998 WL 150992, at *3-4 (vacating default judgment entered as a sanction following a hearing on damages where it became evident that the plaintiff's fraud claim, while facially valid, was not sustainable for want of an essential element of fraud).

**b.  Second Claim for Relief: Violations of Section 17(a) of the Securities Act**

The SEC's second claim for relief is premised under Section 17(a) of the Securities Act. 15 U.S.C. § 77q(a).  This section provides that:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments . . ., directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money . . . by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

"The elements of a claim under [S]ection 17(a) are 'essentially the same as the elements under [Section] 10(b) and Rule 10b-5,' except that [S]ection 17(a)(2) and 17(a)(3) do not require proof of scienter – a showing of negligence is sufficient." *SEC v. Gallagher*, No. 21-cv-8739, 2023 WL 6276688, at *8 (S.D.N.Y. Sept. 26, 2023) (quoting *SEC v. Fiore*, 416 F. Supp. 3d 306, 319 (S.D.N.Y. 2019)).  In light of the foregoing analysis, the Court also vacates the default with respect to the SEC's Section 17(a) claims because, even if the SEC had adequately pled facts supporting that Defendants' conduct was negligent to support its Section 17(a) claim and, thus, overcame the lack of scienter, its Section 17(a) claim nevertheless fails because the omissions, as pled, have been deemed immaterial as a matter of law.

### c.  Third Claim for Relief: Violations of the Advisers Act and SEC Rule 206(4)-8

Finally, the SEC's third claim for relief is premised on violations of Section 206(1), 206(2), and 206(4) of the Advisers Act, and Rule 206(4)-8 promulgated by the SEC pursuant to its authority thereunder.  Specifically, Section 206 of the Advisers Act provides that:

It shall be unlawful for any investment adviser, by use of the mails, or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

24

> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; [or]
>
> ***
>
> (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.

15 U.S.C. § 80b-6(1), (2), (4).

Section 202(a)(11) of the Advisers Act defines "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability or investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analysis or reports concerning securities. . ." 15 U.S.C. § 80b-2(a)(11).   Here, Schrichte, Hill, and Global Management are investment advisers for purposes of the Advisers Act as they were or were intended to be compensated for their management of the Fund's investments. *See SEC v. Saltzman*, 127 F. Supp. 2d 660, 670 (E.D. Pa. 2000) (finding a managing general partner met the definition of investment adviser because he was compensated for his management of the limited partners' investments).

SEC Rule 206(4)-8 prohibits investment advisers to a pooled investment vehicle from making "any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made. . ." or engaging in "any act, practice, or course of business that is fraudulent, deceptive, or manipulative" with respect to investors or prospective investors.   17 C.F.R. § 275.206(4)-8.   A pooled investment vehicle is "any investment company as defined in section 3(a) of the Investment Company Act . . ."   Further, 17 C.F.R. § 275.206(4)-8(b) defines "investment company" as one which, *inter alia*, "is or holds itself out as being engaged primarily,

25

. . . in the business of investing, . . . in securities." 15 U.S.C. § 80a-3.  Here, by definition, the Fund was a pooled investment vehicle.

In its motion for default judgment, the SEC argues that Schrichte, Hill, and Global Management are investment advisers who breached their fiduciary duties under the Advisers Act and, for the same reasons supporting its other claims, violated additional provisions of the Advisers Act and Rule 206(4)-8 by making material omissions in the annual reports.  Opposing these claims, Schrichte appears to rely on the same counter-arguments previously set forth.  Each of the SEC's contentions are addressed below.

### i.  Section 206(1) and 206(2) of the Advisers Act

Section 206(1) and 206(2) of the Advisers Act "set 'federal fiduciary standards' to govern the conduct of investment advisers and impose 'enforceable fiduciary obligations' on those advisers." *SEC v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) (quoting *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979)) (internal citations and quotation marks omitted). Claims under both provisions "are identical and can be analyzed together" except that "[e]stablishing a violation of Section 206(1) requires a demonstration of scienter." *SEC v. McDermott*, No. 19-cv-4229, 2022 WL 952894, at *5 (E.D. Pa. Mar. 30, 2022) (citing *SEC v. Westport Capital*, 408 F. Supp. 3d 93, 106 (D. Conn. 2019)).  Because the Court has already determined that the SEC has failed to plead and/or establish that Defendants acted with scienter, the SEC's Section 206(1) claim fails.  Accordingly, the following analysis concerns only Section 206(2).

To prevail on its claim under Section 206(2) of the Advisers Act, the SEC must establish "that Defendants (1) breached a fiduciary duty they owed their clients under the Advisers Act and (2) did so at least negligently." *SEC v. Ambassador Advisors, LLC*, 576 F. Supp. 3d 286, 293

(E.D. Pa. 2021).  "To fulfill their duty of loyalty, investment advisers must disclose their conflicts of interest, act in their clients' best interest, and seek best execution for their clients' transactions." *Ambassador Advisors*, 576 F. Supp. 3d at 293.  The SEC must prove that Defendants "breached only one of [these three duties] to satisfy the first element of its claim under [Section] 206(2)." *Id.* In this case, though the breach of fiduciary duties theory is scantly averred in the complaint, the SEC appears to focus its default liability argument on Schrichte and Hill's alleged breach of two duties; *to wit*:  conflict disclosure and best interest.  Each is addressed in turn.

### 1.  *Conflict Disclosure*

"To fulfill their duty of conflict disclosure, investment advisers must make 'full and frank' disclosure of any practice that presents a conflict of interest." *Ambassador Advisors*, 576 F. Supp. 3d at 294 (quoting *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 197 (1963)).  "If an investment adviser stands to benefit financially from transacting on behalf of his client, then the adviser must disclose 'that benefit and all related details of the transaction.'" *Id.* at 294 (quoting *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 503 (3d Cir. 2013)).

Here, as discussed above, the only alleged undisclosed conflict of interest are the alleged improper loans from the Fund to Schrichte and Hill via Global Management.  The SEC has not adequately pled, nor presented evidence to establish, that Schrichte and Hill solicited investment in the Fund for any other purpose than to support the development in its sole portfolio company, TeraDact.  To the extent the SEC seeks to have the Court infer that Schrichte and Hill's loans amounting to less than $1 million dollars over seven years evinces that they solicited $21 million in investment in the Fund for their personal financial benefit, such an inference falls flat.  Thus, the SEC's Section 206(2) claim fails when predicated on a breach of the duty of conflict disclosure.

### 2. *Best Interest*

As noted, "[t]he fiduciary duties under § 206(2) require investment advisers to act in the 'best interest' of their clients, which means the adviser must put his client's interests ahead of his own." *Ambassador Advisors*, 576 F. Supp. 3d at 300 (E.D. Pa. 2021) (quoting *Belmont*, 708 F.3d at 503). However, "[u]nder the 'best interest' test, an adviser may benefit from a transaction recommended to a client if, and only if, that benefit and all related details of the transaction are fully disclosed." *Belmont*, 708 F.3d at 503 (citation omitted).

In this case, the complaint avers only that Schrichte and Hill's claimed improper loans and other misappropriations were done "[i]n breach of the fiduciary duty they owed as investment advisers to the Fund[.]" (ECF 1 at ¶ 2). The record, however, establishes that the loans were drawn in an effort to minimize the impact on the Fund's obligation to pay Schrichte and Hill their due management fees and, thus, direct more capital to TeraDact. No evidence was offered to undermine this finding. As such, even if the SEC's claims under Section 206(2) of the Advisers Act were sufficiently pled, the claims fail as a matter of law because the record makes clear that Schrichte and Hill acted solely in the Fund members' interest.

### ii.  *Section 206(4) of the Advisers Act and Rule 206-4(8) Thereunder*

Given that the "elements of a claim under Section 206 are similar to the elements of a claim under Rule 10b-5, and identical to a claim under Section 17(a) of the Securities Act, . . . facts showing a violation of Sections 10(b) or 17(a) by an investment adviser will also support a showing of a Section 206 violation." *Penn*, 225 F. Supp. 3d at 237 (internal citations and quotation marks omitted). Thus, for the reasons set forth when discussing the SEC's claims under those antifraud provisions, the SEC's claims under Section 206(4) of the Advisers Act and Rule 206(4)-8 also fail.

Therefore, because the complaint and the evidence of record make clear that the SEC has failed to establish any violations under the Advisers Act and Rule 206(4)-8, the default judgment is vacated on those claims.

## II.    *Damages*

As noted, the SEC argues that its requested remedies are appropriate and equitable because Defendants misappropriated their clients' funds for their own benefit multiple times, and the resultant securities law violations were committed with scienter.  In his opposition, Schrichte argues that the SEC's proposed remedies are inconsistent with the principles of equity as he paid back both the loans he and Hill obtained from the companies and invested his time and money to keep TeraDact a viable enterprise.  Because the Court concludes that the SEC has failed to prove default liability or to otherwise establish viable securities fraud claims, the Court need not and does not reach the issue of remedies.

**CONCLUSION**

After a careful review of the record, the evidence presented at the hearing on damages, and the parties' submissions, it became evident that the SEC's case against Defendants was not sustainable under any of the antifraud provisions proffered.  At most, the SEC has shown that Schrichte and Hill may have violated the Fund's operating agreement, but not the securities laws. Thus, under the circumstances of this case, a final default judgment against Defendants for their alleged disobedient conduct at the outset of litigation is not appropriate.

Further, based on the totality of the record before it, the Court concludes that the SEC's complaint must be dismissed for the legal and factual deficiencies discussed herein.  Because the Court does not perceive how the claims might become cognizable, the SEC will not be afforded an opportunity to file an amended complaint.  *See Rogers v. Mills*, 516 F. App'x 108, 109 n. 3 (3d.

Cir. 2013) (upholding dismissal with prejudice of a complaint where it was unclear "how any amendment . . . would save [the plaintiff's] claims.").

Accordingly, for the reasons set forth herein, the February 28, 2025 Order is vacated, the SEC's motion for default judgment is denied, and the SEC's complaint is dismissed with prejudice.

*NITZA I. QUIÑONES ALEJANDRO*, J.